IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello

Civil Action No. 13-cv-01872-CMA

IN RE: ADAM AIRCRAFT INDUSTRIES, INC.,
JEFFREY A. WEINMAN, as Chapter 7 Trustee,

    Appellant,

v.

CITY OF PUEBLO, COLORADO, and
GEORGE F. ADAM, JR.,

    Appellees.

## ORDER AFFIRMING BANKRUPTCY COURT'S ORDER

This matter is before the Court on Chapter 7 Trustee Jeffrey A. Weinman's (the "Trustee's") appeal of the Bankruptcy Court's order, entered on June 28, 2013, in adversary proceeding No. 09-1481. The City of Pueblo ("Pueblo") and George F. Adam, Jr. ("Adam") jointly oppose the Trustee's appeal. The Court has jurisdiction under 28 U.S.C. § 158(a)(1). For the following reasons, this Court affirms the judgment of the Bankruptcy Court.

### I. BACKGROUND

In a prior opinion, this Court affirmed in part and remanded in part an order of the Bankruptcy Court on many of the same matters the Trustee raises in this appeal. *See In re Adam Aircraft Indus., Inc.*, No. 12-CV-01573-CMA, 2013 WL 773044 (D. Colo. Feb. 28, 2013) (hereinafter *Adam Aircraft*). In particular, that order addressed two

issues regarding "the Pueblo Collateral," a term the parties use to describe all equipment and after-acquired property located at a facility of the debtor in Pueblo, Colorado. The Pueblo Collateral secured a loan from Pueblo to the debtor. The Trustee sold the Pueblo Collateral with a number of the debtor's other assets in a bulk sale to a third party. The total value of the bulk sale was $10 million. *See Adam Aircraft*, 2013 WL 773044, at *7.

As relevant here, in the prior order, this Court resolved: (1) whether the Bankruptcy Court incorrectly assessed the value of the Pueblo Collateral, and (2) whether, under § 506(c) of the Bankruptcy Code, the Bankruptcy Court improperly applied an eighteen-percent surcharge to Pueblo related to the disposal of the Pueblo Collateral. *Id*. at *4.

As to the first issue, this Court affirmed the decision of the Bankruptcy Court. As to the second issue, however, this Court determined that the Bankruptcy Court committed legal error in the manner in which it calculated the § 506(c) surcharge. This Court therefore remanded the case to the Bankruptcy Court for further consideration of this issue alone. *Id*. at *10.

As this Court detailed in the prior order, the Bankruptcy Court arrived at the eighteen-percent surcharge figure by relying on a spreadsheet that was introduced into evidence as Exhibit 15 ("Exhibit 15") in proceedings before that court. As alleged by the Trustee, Exhibit 15 is a record of all the deposits and disbursements made by the bankruptcy estate related to the sale of all the assets in the bulk sale. (Doc. # 10-12, at 38-50.). Reviewing the costs detailed in Exhibit 15, the Bankruptcy Court calculated

that they added up to $1.8 million or effectively eighteen percent of the $10 million dollar sale of all the property of the estate. The Bankruptcy Court therefore concluded that it was reasonable to apply a blanket *pro rata* surcharge of eighteen percent to Pueblo for the value of Pueblo's portion of the proceeds from the bulk sale. *Id.* at *9-10 (citing the Bankruptcy Court's order).

As this Court explained in greater detail in the prior order, the Bankruptcy Court's application of this eighteen-percent blanket surcharge was in tension with another principle of bankruptcy law which dictates that general administrative expenses are to be paid by the *estate*—not the secured creditor. In short, the problem with the Bankruptcy Court's eighteen-percent blanket surcharge was that it was not apparent from Exhibit 15 and/or the Trustee's testimony that all of the expenditures identified in Exhibit 15 were expenditures that directly benefited Pueblo, as required by § 506(c). In other words, as this Court reasoned:

> It is entirely proper for the Bankruptcy Court to award a surcharge to the Trustee for costs that were proven to be proper § 506(c) expenditures related to the preservation and disposition of the Pueblo Collateral. However, it was error for the Bankruptcy Court to assess against the Pueblo Collateral a blanket 18% pro rata surcharge without considering whether specific costs and expenses directly and primarily benefitted Pueblo, or whether they were . . . administrative expenses or expenses that primarily benefitted the non-Pueblo Collateral.

*Id.* at *10.

Therefore, this Court remanded the case to the Bankruptcy Court with instructions that it "analyze whether and to what extent the evidence showed that particular expenditures incurred by the Trustee (1) were reasonable and necessary specifically for the preservation or disposition of the Pueblo Collateral, and (2) how each

3

of these expenditures primarily benefitted Pueblo in a concrete and quantifiable way." *Id.* (internal quotation marks and citations omitted).

In answering these questions on remand, the Bankruptcy Court reviewed both Exhibit 15 again and the related trial testimony concerning the expenditures identified on Exhibit 15. (*Id.* at 457.) The Bankruptcy Court concluded that the only expenses documented by the Trustee that met the standard announced by this Court in its prior order "are rent costs paid to the Pueblo Depot Activity Development Authority and the Pueblo Development Foundation totaling $7,534. Those payments are as follows: $600 paid to Pueblo Depot on April 9, 2008, $6,334 paid to Pueblo Development on May 6, 2008, and $600 paid to Pueblo Depot on May 6, 2008." (*Id.*)

In response to the Bankruptcy Court's order on remand, the Trustee filed this second appeal, in which he advances four arguments. The first two arguments address the first issue this Court considered in its last appeal: whether the Bankruptcy Court properly assessed the value of the Pueblo Collateral. The next two arguments address the second issue considered in the last appeal and reconsidered by the Bankruptcy Court on remand: namely, the validity of the Bankruptcy Court's method of recalculating the § 506(c) surcharge. The Court addresses these four arguments in turn.

## II.  ANALYSIS

### A. VALUATION OF THE PUEBLO COLLATERAL

As an initial matter, this Court will not consider the first two arguments raised by the Trustee in briefing on his second appeal. (Doc. # 7, at 1-26.) As the Trustee also concedes (Doc. # 8, at 1 n.1), these arguments were raised and rejected by this Court

4

in its prior order. The Court declines to address them again. To the extent these arguments have been properly preserved, the Trustee can revisit them at a higher court.

**B. SURCHARGE CALCULATION**

This leaves the Court with the task of addressing the Trustee's second two arguments. As presented in the opening section of the Trustee's brief, they are: (1) whether the Bankruptcy Court erred in reducing the Trustee's § 506(c) surcharge to $7,524.00 from $161,740.83, without considering the benefits to the secured creditor associated with, and its consent to, the bulk sale of substantially all assets in Chapter 7; and (2) whether the Bankruptcy Court erred in failing to conduct a hearing before effectuating this reduction. (Doc. # 8, at 2.) The Court considers both of these matters as largely interrelated and addresses them together.

1. <u>Common Ground with the Trustee</u>

In resolving these questions, this Court first emphasizes three points of common ground it shares with the Trustee on the law regarding § 506(c) surcharge claims.[1] First, this Court agrees with the Trustee that appropriate items for a § 506(c) surcharge can include "appraisal fees, auctioneer fees, advertising costs, moving expenses, storage charges, payroll of employees directly and solely involved with the disposition of the subject property, maintenance and repair costs, and marketing costs." *In re Visual Indus., Inc.*, 57 F.3d 321, 325 (3d Cir. 1995) (internal citations omitted).

---

[1] The Court emphasizes these commonalities in part because the Trustee alleges that the Court "missed" or misinterpreted the thrust of his argument as it relates to these matters. (Doc. # 16, at 2.)

5

Second, this Court agrees with the proposition articulated by the Trustee that under certain circumstances, "[w]here the benefit to a . . . secured creditor from an expense necessarily incurred by a trustee to preserve or dispose of the secured property is direct, not incidental, it is equitable to prorate the expense among the secured beneficiaries." *In re Nautica Sports Centre, Inc.,* 81 B.R. 144, 145 (Bankr. S.D. Fla. 1987). This same principle could apply to secured assets sold as part of a "going concern" sale of the entirety of a business enterprise. *Cf. In re McKeesport Steel Castings Co.*, 799 F.2d 91, 94 (3d Cir. 1986) ("Preservation of the going concern value of a business can constitute a benefit to the secured creditor.").

Third, it is *possible* that at least some of the expenses listed in Exhibit 15 that were not considered by the Bankruptcy Court could in fact include expenditures that directly and primarily benefited Pueblo. For example, although neither party references this particular expense, this Court notes that the Trustee obtained the services of an auctioneer to facilitate the bulk sale of property in this case and that the auctioneer incurred approximately $20,000 in costs seemingly related to shipping the equipment purchased at auction. (Doc. # 10-12, at 46.) It is possible that some of the equipment shipped by the auctioneer was subject to Pueblo's security interest. Thus, it is possible that a portion of this particular expenditure directly benefited Pueblo in a concrete and particular way because, absent paying this cost, the bulk sale deal may have fallen apart and the bulk sale deal may have benefited Pueblo more than an itemized sale.

### 2. Quality of the Evidence

While there is much common ground to share with the Trustee on the law regarding § 506(c) surcharges, where this Court and the Trustee part ways is principally over the quality of the evidence needed to meet the burden of establishing an expenditure subject to such a surcharge.  *See also* (Doc. # 7, at 186 (counsel for the Trustee noting that the principal issue related to "the surcharge claim" is "the evidentiary foundation for the reasonableness and the amount of that claim").)

It is for this reason that the Trustee's position here is untenable.  In short, the Trustee's arguments on appeal fail because the Trustee: (a) minimizes his burden in establishing that an expense is subject to a § 506(c) surcharge; (b) does not point to any clear errors committed by the Bankruptcy Court in its reconsideration of the evidence submitted at trial in support of a surcharge; and (c) fails to explain why it is possible or useful to remand this matter to the Bankruptcy Court for further consideration or a hearing.  The Court addresses each of these points in turn.

      a)     *Trustee's Burden of Proof*

First, throughout his briefing on this appeal, the Trustee suggests that this Court and the Bankruptcy Court: (1) failed to consider the "underlying purpose of § 506(c) in the context of the Trustee's bulk sale that liquidated all creditors' collateral" or (2) otherwise failed to grasp the thrust of his understanding of this statute.  (Doc. # 8, at 27.)  To the contrary, as should be apparent from the discussion above, this Court accepts in principle that a valid § 506(c) surcharge can be derived by calculating the *pro rata* share of costs derived from the bulk sale of secured collateral.  What this Court

cannot accept is the Trustee's artificial lowering of the standard of proof needed to establish such costs in the first place.

As to this matter, this Court emphasizes again that "[s]urcharging collateral subject to a security interest is the *exception* and *not the rule* for recovering costs and expenses associated with the preservation or disposition of estate property. Ordinarily, the costs and expenses detailed in Section 506(c) are paid from the unencumbered assets of a bankruptcy estate rather than from secured collateral." *In re Smith Intern. Enterprises Inc.*, 325 B.R. 450, 453 (Bankr. M.D. Fla. 2005) (internal citations omitted; emphasis added).

Further, as the Ninth Circuit stated in *In re Debbie Reynolds Hotel & Casino, Inc.*, 255 F.3d 1061, 1068 (9th Cir. 2001), establishing a § 506(c) exception to this general rule "is not an easy standard to meet. It is the party seeking the surcharge that has the burden of showing a 'concrete' and 'quantifiable' benefit. The § 506 recovery is limited to the amount of the benefit actually proven. Because a party seeking a surcharge faces an *onerous burden of proof*, it is unlikely that creditors will use this provision when any other provision of the [Bankruptcy] Code is available." *Id.* at 1068 (internal citation omitted; emphasis added); *see also Adam Aircraft*, 2013 WL 773044, at *8 (citing *Debbie Reynolds*).

In this case, the Trustee apparently decided that he could meet his "onerous" burden under § 506(c) by admitting Exhibit 15 into evidence and then testifying very generally that all $1.8 million in expenditures identified in Exhibit 15 were incurred in furtherance of the bulk sale. At best, the evidence submitted by the Trustee to the

Bankruptcy Court might give rise to an inference that these expenditures may have hypothetically benefitted Pueblo. However, such an inference falls far short of proving a "concrete and quantifiable" benefit to Pueblo, especially when numerous expenditures contained in Exhibit 15 contradict the Trustee's general testimony.

By way of example, this Court more concretely identifies the precise type of problems it sees with the evidence presented by the Trustee. This Court emphasizes that it is undertaking this exercise merely to *illustrate* why the evidence submitted by the Trustee fails to meet his burden under § 506(c). Thus, for brevity's sake this Court limits its analysis to only one of the pages included in Exhibit 15, which in relevant part provides as follows:

| Transaction Date | Paid To | Description of Transaction | Disbursements |
|---|---|---|---|
| 5/30/2008 | Jeffrey Weinman, Trustee | Trustee Compensation and Expenses | $273,829.10 |
| 06/06/2008 | Lindquist & Vennum PLLP | Attorney Fees and Expenses—Court order dated 4/22/08 | $287,582.56 |
| 06/09/2008 | General Capital Partners | Marketing/Consulting Fees and Expenses Court Order dated 6/6/08 | $126,555.29 |
| 06/24/2008 | DoveBid, Inc. | Auctioneer Expenses Court Order dated 3/26/08 | $107,528.71 |
| **Total** | | | **$795,495.66** |

(Doc. # 10-12, at 48). This is the entirety of the written description of what these four expenses entailed. Together, the expenses listed above amount to almost half of the $1.8 million allegedly attributable to the bulk sale that included the Pueblo Collateral. (Doc. # 7, at 76 n.15.) At trial before the Bankruptcy Court, the Trustee supplemented this written record with testimony about the logistics involved in the bulk sale and the costs necessary for the same. (*Id.* at 203-36.)

Even if this Court accepts the premise that every expense directed toward a bulk sale is countable as part of a § 506(c) surcharge, there are serious problems with concluding that each of the expenses listed in the above table were "reasonable and necessary" for the preservation and disposition of the items sold in the bulk sale, much less that they benefited Pueblo "in a concrete and quantifiable way." *Adam Aircraft*, 2013 WL 773044, at *10.

First, there is no itemization of what drives the large expenditures included in the above table and there are indications that the unitemized costs could cover more than the bulk sale. For example, all of the expenses listed in the above table post-date the mid-April sale of the assets by at least a month and a half.[2] While it is possible that many of these expenses were derived from sale-related activities, in testimony before the Bankruptcy Court, the Trustee implied the opposite. In particular, when asked about what was contained in Exhibit 15, the Trustee simply stated that it was generally the "receipts and disbursements journal, if you will, . . . for this estate, for the Adam Aircraft estate." (Doc. # 7, at 211) Counsel for the Trustee further obscured matters by asking if Exhibit 15 "*include[d]* the expenses and costs that you incurred on behalf of the estate in the sales transaction," to which the Trustee tepidly responded, "I believe so." (*Id.* (emphasis added)) Finally, the Trustee suggested that Exhibit 15 included costs related to "some post-closing matters which had to be addressed for a period of time." (*Id.*)

---

[2] The Trustee noted at trial that "my recollection is that by April 15th [, 2008] the [bulk] sale had occurred and—excuse me, had closed—and that the sale had occurred sometime before that, perhaps a week or so before that." (Doc. # 7, at 209.) As noted in the table, all of the noted expenditures were recorded in late May through late June 2008.

10

This record evidence is insufficient for the Trustee to meet the concreteness requirement of § 506(c).  Rather, based on this record evidence, it is easy to draw the conclusion that the $1.8 million identified in Exhibit 15 "include" *but are not limited* to those related to the bulk sale.  Further complicating matters is the fact that these expenses also include some undefined "post-closing matters" that may or may not have been related to same sale.[3]

Second, the Trustee provides almost no evidence substantiating his position that many of these costs were necessary for the bulk sale.  A particularly glaring example of this problem comes with the Trustee's efforts to substantiate the attorney and trustee fees as "necessary."  This Court reproduces in full the exchange between a Lindquist attorney and the Trustee as to these matters:

> [Question from Linquist Attorney:] Now there are two payments in the middle of that page; one to you on account of trustee compensation, and one to Lindquist and Vennum for attorney's fees and expenses. Do you see those?
>
> [Trustee's Answer:] Yes.
>
> [Second Question from Linquist Attorney:] Are—
>
> [Trustee's Answer:] They're absolutely necessary.

---

[3] In briefing before this Court the Trustee stated "[t]he undisputed evidence at trial was that all of the sale fees and expenses through the closing date and admitted as Trustee's Trial Exhibit 15 were incurred in connection with the sale and not with respect to any other general estate administrative matters.  Record, p. 219, ll. 8-22; p. 44." (Doc. #8, at 28-29.)  The Court does not understand how to interpret the Trustee's citation to the record: page 219 of the appellate record and page 44 of the trial transcript—both of which seem to be referenced here—discuss only specific line items that the Trustee alleged were necessary for the bulk sale and do not support the Trustee's specific proposition.  Nevertheless, this Court's independent analysis of the record establishes why this legal conclusion undermines the Trustee's position here.

(Doc. # 7, at 221.)  Were it only so easy to obtain approval for half a million dollars' worth of fees, especially from the property of a secured creditor, as opposed to the unencumbered assets of the estate.  In the above colloquy, the Trustee did not even have to be asked the second question to know the answer: of course, everything he asked to be paid must have been necessary for the bulk sale—and the same holds for the attorney conducting his direct examination.  This self-interested colloquy is all this Court can find in the record to substantiate the necessity of these two costs.

Again, the Court identifies the above deficiencies in the Trustee's § 506(c) surcharge evidence not because it is necessary for this Court to undermine the validity of each line item in Exhibit 15.  Rather, this Court points to such deficiencies because they are emblematic of the fatal flaw in the Trustee's argument before this Court: he can argue only that it is theoretically possible that many expenses included in Exhibit 15 were related to the bulk sale and served to Pueblo's benefit.

The bankruptcy law related to § 506(c) surcharges requires more than what the Trustee has provided.  While "§ 506(c) is designed to prevent a windfall to the secured creditor at the expense of [other] claimant[s]," *In re Visual Indus., Inc.*, 57 F.3d 321, 325 (3d Cir. 1995), the rule should not serve as a mechanism to fleece those same secured creditors for additional costs that others should bear.  To the contrary, the concreteness requirement of § 506(c) polices against attempts by the bankruptcy estate to overcharge expenses or to disguise what are in fact generalized costs as costs necessary for the effectuation of a bulk sale.  The rule duly serves that same purpose here in limiting the

amount of surcharge the Trustee can collect from a secured creditor—in this case, Pueblo.[4]

### b) Clear Error

Next, the Court addresses the Trustee's claim that the Bankruptcy Court improperly considered evidence on remand. As noted above, the Bankruptcy Court reviewed the record evidence again—including Exhibit 15—and concluded that the only expenses documented by the Trustee that met the standard announced by this Court in its prior order "are rent costs paid to the Pueblo Depot Activity Development Authority and the Pueblo Development Foundation totaling $7,534." (Doc. # 7, at 437.)

The Trustee attacks this fact finding as incomplete and argues that the Bankruptcy Court should have included other items in its analysis. This Court reviews the Bankruptcy Court's finding for clear error, which means that it will only disturb the judgment of that court if the finding "is without factual support in the record or if, after

---

[4] Nothing in this Court's order precludes the Trustee from seeking payment for his services or reimbursement for expenses incurred in administering the estate. To the contrary, the Trustee can apply to have these amounts paid from the unencumbered assets of the estate. Further, in his Reply, the Trustee notes that Pueblo consented to the Trustee's bulk sale and appears to argue that consent to the sale necessarily entails consent to every expenditure the Trustee deems necessary to that sale. (Doc. # 16, at 4.) The Court finds this argument unpersuasive. First, the Trustee fails to establish, with citation to the record, the scope of the Pueblo's consent with regard to the bulk sale. Second, while this Court again agrees in principle with the Trustee that consent to the bulk sale could be equated with consent to the steps necessary to effectuate that sale, *cf. In re Strategic Labor, Inc.*, 467 B.R. 11, 22 (Bankr. D. Mass. 2012) ("A secured creditor may not have consented to a specific expenditure but may be subject to surcharge if it can be shown that the creditor acknowledged the desirability of the expenditure."), such an argument cannot be used to make an end run around the concreteness requirement in § 506(c) surcharges. Third, because the Trustee principally raised this issue in his Reply this court does not have the benefit of Pueblo's position on this argument—and the Trustee may have forfeited reliance on this argument. *See Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief.").

reviewing all of the evidence, we are left with the definite and firm conviction that a mistake has been made." *In re Ford*, 492 F.3d 1148, 1153 (10th Cir. 2007) (internal citations omitted).

For a number of reasons, the Trustee cannot meet this standard.  As an initial matter, the Trustee only vaguely asserts that the Bankruptcy Court "ignored record evidence concerning the quantifiable and direct benefits conferred by the Trustee's going concern sale" (Doc. # 8, at 1), without specifying what that improperly ignored evidence is.  This Court could try and guess what the Trustee is talking about, but this would be a purely academic exercise.  This Court will not do the Trustee's job of advocacy for him, and merely because a theory is theoretically viable, it does not follow that the Bankruptcy Court's failure to *sua sponte* consider or explicitly reject such a theory is grounds for reversal.  *Cf. Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 702-03 (7th Cir. 2010) ("Judges are not like pigs, hunting for truffles buried in the record." (alterations incorporated)); *Corley v. Rosewood Care Ctr., Inc. of Peoria,* 388 F.3d 990, 1001 (7th Cir.2004) ("[W]e will not root through the hundreds of documents and thousands of pages that make up the record here to make his case for [a party].").

Second, the manner in which the Trustee presented the evidence at trial—with non-itemized expenses that the Trustee never demonstrated were connected to the bulk sale, much less resulted in a direct benefit to Pueblo—means that this Court has no definite and firm conviction that a mistake has been made.  To be sure, this Court acknowledges that the ultimate surcharge amount here could under-value the *actual* surcharge that might have been obtained under different circumstances.  But fault for

that undervaluation lies not with the Bankruptcy Court but with the Trustee: he failed to present more particularized evidence on these matters.[5]

### c) *Hearing on Remand*

Lastly, this Court is not persuaded by the Trustee's argument that the Bankruptcy Court erred in declining to conduct a hearing after remand. First, this Court did not order such a hearing on remand—and it sees nothing in its prior order that could even imply that it did so. Further, the Trustee cites no case law—and this Court finds none—supporting his apparent position that he should get a second bite at the apple by being allowed to enter further evidence into the record before the Bankruptcy Court.

Finally, the Trustee does not even concretely say what he would have done at a hearing on remand, thus leaving this Court in the dark about the prejudice the Trustee suffered from this alleged error from the Bankruptcy Court. Further, to the extent that the Trustee's intended goal in that hypothetical hearing was to visit with the Bankruptcy Court the arguments he raised with this Court, the above analysis should demonstrate why that would have been an ultimately fruitless exercise.

---

[5] The Trustee also contends that the Bankruptcy Court committed error on remand by disregarding the distraint warrant that required the Trustee to expend time and money to access the Pueblo facility that housed Pueblo's collateral. (Doc. # 13, at 29.) The Trustee alleges that those expenses directly benefited Pueblo. For similar reasons, the Bankruptcy Court's decision not to consider such evidence was not clearly erroneous given the difficulties in (or the impossibility of) determining how such expenses are itemized—or even if specific expenses were incurred for this activity.

## III. **CONCLUSION**

For the above stated reasons it is hereby ORDERED that the judgment of the Bankruptcy Court is AFFIRMED.

DATED:  March 28, 2014

BY THE COURT:

*Christine M Arguello*

_____
CHRISTINE M. ARGUELLO
United States District Judge